**FILED**

**AUG 1 3 2010**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

1   Gayle George
2   412 Quackenbos NW Street
3   Washington DC 20001
    202. 882.2210

4                       UNITED STATES DISTRICT COURT
5                            DISTRICT OF COLUMBIA

Gayle George

Plaintiff,

vs.

**Bank of America NA**

Defendant

| Case: 1:10-cv-01359 |
| Assigned To : Collyer, Rosemary M. |
| Assign. Date : 8/13/2010 |
| Description: Pro Se Gen. Civil |

6

7                           Complaint   Date: 29 July 2010

8    Comes now Gayle  George, hereinafter referred to as "Petitioner," and moves the court for

9    relief as herein requested:

10                                  **PARTIES**

11   Petitioner is Gayle  George,  412 Quackenbos NW Street  Washington DC 20001.  Currently

12   Known Defendant(s) are/is:  Bank of America NA , 400 Countrywide Way , Simi Valley , CA

13   93065, by and through its attorney.

14                             **STATEMENT OF CAUSE**

15   Petitioner, entered into a consumer contract for the refinance of a primary residence located at

16   412 Quackenbos NW Street  Washington DC 20001, hereinafter referred to as the "property."

17   Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

18   predatory loan agreement with Defendant.

19   Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

20   crafted scheme intended to defraud Petitioner.

21   Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

22   of the types of tactics used by Defendants to defraud Petitioner.

23   Defendants charged false fees to Petitioner at settlement.

CIVIL PETITION                                                          1 of 24

**RECEIVED**

AUG - 2 2010

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

24   Defendants used the above referenced false fees to compensate agents of Petitioner in order to
25   induce said agents to breach their fiduciary duty to Petitioner.

26   Defendant's attorney caused to be initiated collection procedures, knowing said collection
27   procedures in the instant action were frivolous as lender is estopped from collection procedures,
28   under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
29   the production of the original promissory note alleged to create a debt.

30                                           **IN BRIEF**
31                              *(Non-factual Statement of Posture and Position)*

32    It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
33   making a number of allegations that, outside the context of the current condition of the real
34   estate industry, may seem somewhat outrageous and counter-intuitive.

35   When Petitioner accuses ordinary individuals of acting in concert and collusion with an
36   ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
37   unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
38   people, just doing what they have been trained to do, are out to swindle the poor
39   unsuspecting borrower.

40   The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
41   committed by people acting in concert and collusion, one with the other.  Petitioner has no
42   reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
43   that what they were doing was part of an ongoing criminal conspiracy, only that it was,
44   and they, at the very least, kept themselves negligently uninformed of the wrongs they
45   were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
46   courts, for failure to strictly enforce the consumer protection laws.

47                          **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
48                              *(General State of the Real Estate Industry)*

49   ***THE BEST OF INTENTIONS***

50   Prior to the 1980's and 1990's ample government protections were in place to protect
51   consumers and the lending industry from precisely the disaster we now experience.
52   During President Clinton's administration, under the guise of making housing available to

ORIGINAL PETITION                                                        2 of 24

53  the poor, primary protections were relaxed which had the effect of releasing the
54  unscrupulous on the unwary.

55  Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
56  the risk.  Consequently, Americans were engaged in safe and stable home mortgages.
57  With the protections removed, the unscrupulous lenders swooped in and, instead of
58  making loans available to the poor, used the opportunity to convince the unsophisticated
59  American public to do something that had been traditionally taboo; home buyers were
60  convinced to speculate with their homes, their most important investment.

61  Bank of America NA , Ameriquest, Countrywide, and many others swooped in and
62  convinced Americans to sell their homes, get out of their safe mortgage agreements, and
63  speculate with the equity they had gained by purchasing homes they could not afford.
64  Lenders created loans intended to fail as, under the newly crafted system, the Lender
65  profited more from a mortgage default than from a stable loan.

66  Companies cropped up who called themselves banks when, in fact, they were only either
67  subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
68  creating and selling promissory notes.  As will be demonstrated, these companies then
69  profited from the failure of the underlying loans.

70  ***HOW IT WORKS***

71  Briefly, how it works is this, the Lender would secure a large loan from a large bank,
72  convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
73  investor.

74  People would set up mortgage companies buy securing a large loan from one of the major
75  banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
76  an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
77  lender who would secure the title from the seller using the borrowed bank funds for that
78  purpose, and then trade the title to the buyer in exchange for a promissory note.

79  The lender then creates a 20 or 30 year mortgage with money the lender must repay within
80  6 months.  As soon as the closing is consummated, the promissory note is sold to an
81  investor pool.

82  Using the instant case as an example, a 417,000.00 note at 6.6290%%  interest over 30
83  years will produce $481,466.82     The lender can then offer to the investor the security

ORIGINAL PETITION

84    instrument (promissory note) at say 50% of it's future value. The investor will, over the
85    life of the note, less approximately 3.00% servicing fees, realize $471,668.12 . The lender
86    can then pay back the bank and retain a handsome profit in the amount of $83,843.47. The
87    lender, however, is not done with the deal.

88    The lender signed over the promissory note to the investor at the time of the trade, but did
89    not sign over the lien document (mortgage or deed of trust). The State of Kansas Supreme
90    Court addressed this issue and stated that such a transaction was certainly legal. However,
91    it created a fatal flaw as the holder of the lien document, at time of sale of the security
92    instrument, received consideration in excess of the lien amount. Since the lien holder
93    received consideration, he could not be harmed.    Therefore the lien became an
94    unenforceable document.

95    This begs the question: if keeping the lien would render it void, why would the lender not
96    simply transfer the lien with the promissory note? The reason is because the lender will
97    hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
98    amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
99    liability. The lender, by this maneuver, gets consideration a second time. And still the
100   lender is not done profiting from the deal.

101   After sale of the promissory note, the lender remains as the servicer for the investor. The
102   lender will receive 3% of each payment the lender collects and renders to the investor
103   pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep
104   that amount. Also, if the loan defaults, the lender stands to gain thousands for handling the
105   foreclosure.

106   The lender stands to profit more from a note that is overly expensive, than from a good
107   stable loan. And where, you may ask, does all this profit come from? It comes from the
108   equity the borrower had built up in the home. And still the lender is not finished profiting
109   from the deal.

110   Another nail was driven in the American financial coffin when on the last day Congress
111   was in session in 2000 when restrictions that had been in place since the economic
112   collapse of 1907 were removed. Until 1907  investors were allowed to bet on stocks
113   without actually buying them. This unbridled speculation led directly to an economic
114   collapse. As a result the legislature banned the practice, until the year 2000. In 2000 the
115   unscrupulous lenders got their way on the last day of the congressional session. Congress

ORIGINAL PETITION                                                                4 of 24

116  removed the restriction banning derivatives and again allowed the practice, this time
117  taking only 8 years to crash the stock market. This practice allowed the lender to profit
118  further from the loan by betting on the failure of the security instrument he had just sold to
119  the unwary investor, thus furthering the purpose of the lender to profit from both the
120  borrower (consumer) and the investor.

121  The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
122  bailout at the expense of the taxpayer. The unsuspecting consumer was lulled into
123  accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
124  were acting under the guise of government regulation and, therefore, the borrower had
125  reason to expect good and fair dealings from all. Unfortunately, the regulations in place to
126  protect the consumer from just this kind of abuse were simply being ignored.

127  The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
128  the referral of the client to the lender by a person acting as an agent for the borrower.
129  Hereinafter, the person or entity who receives any portion of the yield spread premium, or
130  a commission of any kind consequent to securing the loan agreement through from the
131  borrower will be referred to as "Agent." The fee, authorized by the consumer protection
132  law is restricted to 1% of the principal of the note. It was intended that the Agent, when
133  seeking out a lender for the borrower, would seek the best deal for his client rather than
134  who would pay him the most. That was the intent, but not the reality. The reality is that
135  Agents never come away from the table with less than 2% or 3% of the principal. This is
136  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
137  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
138  product than the borrower qualifies for. This will generate more profits for the lender and,
139  consequently, for the Agent.

140  It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
141  the fair market price. This allows the lender to increase the cost of the loan product and
142  give the impression that the borrower is justified in making the purchase.

143  The lender then charges the borrower an underwriting fee in order to convince the
144  borrower that someone with knowledge has gone over the conditions of the note and
145  certified that they meet all legal criteria. The trustee, at closing, participates actively in the
146  deception of the borrower by placing undue stress on the borrower to sign the large stack
147  of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to

ORIGINAL PETITION                                                                    5 of 24

148  insure the transaction. This trust is systematically violated for the purpose of taking unfair
149  advantage of the borrower.  The entire loan process is a carefully crafted contrive
150  connivance designed and intended to induce the unsophisticated borrower into accepting a
151  loan product that is beyond the borrowers means to repay.  With all this, it should be a
152  surprise to no one that this country is having a real estate crisis.

153                              **PETITIONER WILL PROVE THE FOLLOWING**
154  Petitioner is prepared to prove, by a preponderance of evidence that:

155    • Lender has no legal standing to bring collection or foreclosure claims against the
156       property;

157    • Lender is not a real party in interest in any contract which can claim a collateral
158       interest in the property;

159    • even if Lender were to prove up a contract to which Lender had standing to enforce
160       against Petitioner, no valid lien exists which would give Lender a claim against the
161       property;

162    • even if Lender were to prove up a contract to which Lender had standing to enforce
163       against Petitioner, said contract was fraudulent in its creation as endorsement was
164       secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
165       the inducement, fraud in the execution, usury, and breaches of contractual and
166       fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
167       Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
168       Pooled  Assets,"  "Trustee  or  officers  of  Structured  Investment  Vehicle,"
169       "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
170       'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
171       bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
172       pooled together in a trust fund;

173    • Defendants have concocted a carefully crafted connivance wherein Lender
174       conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
175       by inducing Plaintiff to enter into a predatory loan inflated loan product;

176    • Lender received unjust enrichment in the amount of 5% of each payment made late
177       to Lender while Lender and Lender's assigns acted as servicer of the note;

ORIGINAL PETITION

178    • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
179       handling the foreclosure process on a contract Lender designed to have a high
180       probability of default;

181    • Lender intended to defraud Investor by converting the promissory note into a
182       security instrument and selling same to Investor;

183    • Lender intended to defraud Investor and the taxpayers of the United States by
184       withholding the lien document from the sale of the promissory note in order that
185       Lender could then hold the lien for three years, then prepare and file Internal
186       Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
187       and deduct same from Lender's income tax obligation;

188    • Lender defrauded backers of derivatives by betting on the failure of the promissory
189       note the lender designed to default;

190    • participant Defendants, et al, in the securitization scheme described herein have
191       devised business plans to reap millions of dollars in profits at the expense of
192       Petitioner and others similarly situated.

193                              **PETITIONER SEEKS REMEDY**

194    In addition to seeking compensatory, consequential and other damages, Petitioner seeks
195    declaratory relief as to what (if any) party, entity or individual or group thereof is the
196    owner of the promissory note executed at the time of the loan closing, and whether the
197    Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
198    Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
199    alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

200    ***PETITIONER HAS BEEN HARMED***

201    Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

202    Such harm and detriment includes economic and non-economic damages, and injuries to
203    Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

204    In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
205    equitable relief requested herein is granted.

206        **STATEMENT OF CLAIM**

207        *DEFENDANTS LACK STANDING*

208        **No evidence of Contractual Obligation**

209   Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
210   produce said contract.  Even if Defendants produced evidence of the existence of said contract in
211   the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
212   that a contract actually existed at one point in time.  A copy, considering the present state of
213   technology, could be easily altered.  As Lender only created one original and that original was
214   left in the custody of Lender, it was imperative that Lender protect said instrument.

215   In as much as the Lender is required to present the original on demand of Petitioner, there can be
216   no presumption of regularity when the original is not so produced.   In as much as Lender has
217   refused Petitioner's request of the chain of custody of the security instrument in question by
218   refusing to identify all current and past real parties in interest, there is no way to follow said
219   chain of custody to insure, by verified testimony, that no alterations to the original provisions in
220   the contract have been made.    Therefore, the alleged copy of the original is only hearsay
221   evidence that an original document at one time existed.  Petitioner maintains that, absent
222   production of admissible evidence of a contractual obligation on the part of Petitioner,
223   Defendants are without standing to invoke the subject matter jurisdiction of the court.

224        **No Proper Evidence of Agency**

225   Defendants claim agency to represent the principal in a contractual agreement involving
226   Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
227   pronouncement that agency has been assigned by some person, the true identity and capacity of
228   whom has not been established.  Defendants can hardly claim to be agents of a principal then
229   refuse to identify said principal.  All claims of agency are made from the mouth of the agent with
230   no attempt to provide admissible evidence from the principal.

231   Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
232   court.

233  **Special Purpose Vehicle**

234  Since the entity now claiming agency to represent the holder of the security instrument is not the
235  original lender, Petitioner has reason to believe that the promissory note, upon consummation of
236  the contract, was converted to a security and sold into a special purpose vehicle and now resides
237  in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue
238  Code and as such, cannot be removed from the REMIC as such would be a prohibited
239  transaction.   If the mortgage was part of a special purpose vehicle and was removed on
240  consideration of foreclosure, the real party in interest would necessarily be the trustee of the
241  special purpose vehicle. Nothing in the pleadings of Defendants indicates the existence of a
242  special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
243  cause to believe defendant is not the proper agent of the real party in interest.

244  *CRIMINAL CONSPIRACY AND THEFT*

245  Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
246  a criminal conspiracy to defraud Petitioner. Said conspiracy but are not limited to acts of
247  negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
248  acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
249  Petitioner by Lender, which were then used to fund the improper payment of commission fees to
250  Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

251  *AGENT PRACTICED UP-SELLING*

252  By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner. In so
253  doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
254  that Agent was licensed by the state. Agent further defrauded Petitioner by failing to disclose
255  Agent's conspiratorial relationship to Lender,  Agent violated Agent's fiduciary duty to
256  Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
257  connivances, wherein Agent proactively made knowingly false and misleading statements of
258  alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
259  Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
260  a loan product offered by the Lender. Said loan product was more expensive than Petitioner
261  could legally afford. Agent acted with full knowledge that Petitioner would have made a
262  different decision had Agent given complete disclosure.

290   When Lender received consideration while still holding the lien and said consideration was in
291   excess of the amount of the lien, Lender was in a position such that he could not be harmed and
292   could not gain standing to enforce the lien. The lien was, thereby, rendered void.

293   Since the separation of the lien from the security instrument creates such a considerable concern,
294   said separation certainly begs a question: "Why would the Lender retain the lien when selling the
295   security instrument?"

296   When you follow the money the answer is clear. The Lender will hold the lien for three years,
297   then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
298   the full amount from Lender's tax liability, thereby, receiving consideration a second time.

299   Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
300   lien to the holder of the security, however, the lien once satisfied, does not gain authority just
301   because the holder, after receiving consideration, decides to transfer it to someone else.

302   **LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES**

303   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
304   information that Lender had as a result of creating the faulty loans sure to default. Lender was
305   then free to invest on the bet that said loan would default and stood to receive unjust enrichment
306   a third time. This credit default swap derivative market scheme is almost totally responsible for
307   the stock market disaster we now experience as it was responsible for the stock market crash in
308   1907.

309   **LENDER CHARGED FALSE FEES**

310   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
311   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
312   vendor.

313   Lender charged other fees that were a normal part of doing business and should have been
314   included in the finance charge.

315   Below is a listing of the fees charged at settlement. Neither at settlement, nor at any other time
316   did Lender or Trustee provide documentation to show that the fees herein listed were valid,
317   necessary, reasonable, and proper to charge Petitioner.

ORIGINAL PETITION                                                                11 of 24

398   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
399   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
400   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
401   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
402   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
403   of precedential value, this Court has previously found both the TILA and **RESPA** limitations
404   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
405   *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

406   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
407   by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
408   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
409   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
410   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
411   any wrongful conduct by the Defendants. Santa Maria. at 1178.

412   *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
413   *STANDARDS*

414   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
415   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
416   evidencing title, employment information, and other information and documentation that could
417   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
418   ability to repay a particular loan over both the short and long term. Defendants deviated from and
419   disregarded these standards, particularly with regard to its riskier and more profitable loan
420   products.

421   **Low-Documentation/No-Documentation Loans.**

422   Driven by its desire for market share and a perceived need to maintain competitiveness with the
423   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
424   documentation loan products, including the HARMs and HELOCs described hereinabove, and
425   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
426   the already eased underwriting standards to the point of disregarding such standards. This
427   quickened the loan origination process, allowing for the generation of more and more loans
428   which could then be resold and/or securitized in the secondary market.
      ORIGINAL PETITION                                                          15 of 24

489     Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
490     engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
491     business practices described above in paragraphs 30-42 of this Complaint

492     *UNJUST ENRICHMENT*

493     Petitioner is informed and believes that each and all of the Defendants received a benefit at
494     Petitioner's expense, including but not limited to the following: To the Agent, commissions,
495     yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
496     be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
497     surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
498     resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
499     percentages of payment proceeds, charges, and other "back end" payments in amounts to be
500     proved at trial; To all participants, the expectation of future revenues from charges, penalties and
501     fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

502     By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
503     and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
504     deprived, and is entitled to restitution in the amount of $473,599.15

505     *CLAIM TO QUIET TITLE.*

506     Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
507     the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
508     interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
509     and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

510     Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
511     power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
512     interest in the Subject Property has been rendered void and that the Defendants are not the holder
513     in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
514     involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

515         "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
516         scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
517         *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
518         *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

ORIGINAL PETITION                                   

519        *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
520        *Rptr. 2d 752 (2d Dist. 1995).*

521        ***SUFFICIENCY OF PLEADING***

522        Petitioner has sufficiently pled that relief can be granted on each and every one of the
523        Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
524        doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
525        entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
526        allegations of material fact in the complaint are taken as true and construed in the light most
527        favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

528        Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
529        8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
530        theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
531        *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
532        conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
533        should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
534        Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
535        their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
536        relief as requested herein should be granted.

537                                          **CAUSES OF ACTION**

538        ***BREACH OF FIDUCIARY DUTY***

539        Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
540        duty of care with respect to the mortgage loan transactions and related title activities involving
541        the Trust Property.

542        Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
543        breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
544        all applicable laws governing the loan transactions in which they were involved, including but
545        not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

546        Defendant's breaches of said duties were a direct and proximate cause of economic and non-
547        economic harm and detriment to Petitioner(s).

ORIGINAL PETITION                                                      19 of 24

548 Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
549 all to be shown according to proof at trial of this matter.

*CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

551 Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
552 duty to properly perform due diligence as to the loans and related transactional issues described
553 hereinabove.

554 In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
555 X and Z promulgated there under to, among other things, provide proper disclosures concerning
556 the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
557 or should have known that borrowers could not afford or maintain, and to avoid paying undue
558 compensation such as "yield spread premiums" to mortgage Agents and loan officers.

559 Defendants knew or in the exercise of reasonable care should have known, that the loan
560 transactions involving Petitioner and other persons similarly situated were defective, unlawful,
561 violative of federal and state laws and regulations, and would subject Petitioner to economic and
562 non-economic harm and other detriment.

563 Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
564 Z promulgated there under were intended and designed to protect, and the conduct alleged
565 against Defendants is the type of conduct and harm which the referenced statutes and regulations
566 were designed to deter.

567 As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
568 non-economic harm in an amount to be shown according to proof at trial.

*AGENT: COMMON LAW FRAUD*

570 If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
571 negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
572 ground for believing them to be true.

573 Agents made these representations with the intention of inducing Petitioner to act in reliance on
574 these representations in the manner hereafter alleged, or with the expectation that Petitioner
575 would so act.

ORIGINAL PETITION                                    20 of 24

576   Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
577   in their negligent misrepresentation, and that various Agents were negligent in not implementing
578   procedures such as underwriting standards oversight that would have prevented various Agents
579   from facilitating the irresponsible and wrongful misrepresentations of various Agents to
580   Defendants.

581   Petitioner is informed and believes that Agent acted in concert and collusion with others named
582   herein in promulgating false representations to cause Petitioner to enter into the LOAN without
583   knowledge or understanding of the terms thereof.

584   As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
585   Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
586   opportunities, attorney fees and costs, and other damages to be determined at trial. As a
587   proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
588   suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
589   mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
590   at trial.

591   ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
592   ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

593   Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
594   fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
595   performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
596   *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
597   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
598   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

599   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
600   particular significance, in part because of the special relationship between the insurer and the
601   insured. The insurer, when determining whether to settle a claim, must give at least as much
602   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
603   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

604   Likewise, there is a special relationship between an Agent and borrower. "A person who
605   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or

606     otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
607     consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
608     be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
609     *good faith. If the Agent knew or should have known that the Borrower will or has a likelihood of*
610     *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
611     (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
612     [*Emphasis Added*].

613     All Defendants, willfully breached their implied covenant of good faith and fair dealing with
614     Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
615     provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
616     product without regard for other more affordable products; (4) Placed Petitioner into a loan
617     without following proper underwriting standards; (5) Failed to disclose to Petitioner that
618     Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
619     valid and /or properly documented substitutions and assignments so that Petitioner could
620     ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
621     request for documentation of the servicing of Petitioner's loan and the existence and content of
622     relevant documents. Additionally, Defendants breached their implied covenant of good faith and
623     fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
624     right under an alleged power of sale because the purported assignment was not recorded and by
625     willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
626     special relationship inherent in a real estate transaction between Agent and borrower, *and* all
627     Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

628     ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
629     ***SEQ***

630     Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
631     contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
632     Action as though the same were set forth herein.

633     Petitioner is informed and believes that Defendant's violation of the provisions of law rendered
634     the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
635     Property, and entitles Petitioner to damages as proven at trial.

ORIGINAL PETITION                                           22 of 24

636     *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

637     The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
638     highly leveraged and vulnerable consumers who placed their faith and trust in the superior
639     knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
640     civilized society.

641     Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
642     distress, or acted in conscious and/or reckless disregard of the probability that such distress
643     would occur.

644     Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
645     conduct of Defendants as described hereinabove.

646     As a result of such severe emotional distress, Petitioner suffered economic and non economic
647     harm and detriment, all to be shown according to proof at trial of this matter.

648     Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
649     Petitioner and secure to Petitioner quite title;

650     Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
651     as payments to Defendants based on the fraudulently secured promissory note in an amount to be
652     calculated by Defendants and verified to Petitioner;

653     Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
654     amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
655     equal to $1,420,797.45

656                                    **PRAYER**
657     WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
658     as follows:

659         For an emergency restraining order enjoining lender and any successor in interest from
660         foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
661         herein;

662         For a permanent injunction enjoining Defendants from engaging in the fraudulent,
663         deceptive, predatory and negligent acts and practices alleged herein;

664         For quiet title to Property;
        ORIGINAL PETITION                                              23 of 24

665   For rescission of the loan contract and restitution by Defendants to Petitioner according
666   to proof at trial;

667   For disgorgement of all amounts wrongfully acquired by Defendants according to proof
668   at trial;

669   For actual monetary damages in the amount $473,599.15;

670   For pain and suffering due to extreme mental anguish in an amount to be determined at
671   trial.

672   For pre-judgment and post-judgment interest according to proof at trial;

673   For punitive damages according to proof at trial in an amount equal to $1,420,797.45.

674   For attorney's fees and costs as provided by statute; and,

675   For such other relief as the Court deems just and proper.

676   **Respectfully Submitted,**
677
678
679   **Gayle George**

ORIGINAL PETITION                                                    24 of 24